UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| JESSICA NILES, individually and A/A/O Eric Motsenbocker | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 2:21-cv-00265-JAW |
| TRAVELERS HOME AND MARINE INSURANCE COMPANY, | ) ) ) ) ) | |
| Defendant. | ) | |

**ORDER ON SUMMARY JUDGMENT**

An insurance company brings a motion for summary judgment on whether its homeowner's policy provides coverage for tort claims brought against its insured. The insurance company argues that it did not breach its insurance contract when it declined to defend and indemnify the insured because it had no duty to do so against the claims now assigned to the plaintiff. The plaintiff as assignee brings a motion for partial summary judgment and argues that the insurance company breached its contract because it had both the duty to defend and indemnify the insured. The Court concludes that the insurance company had no duty to defend or indemnify and grants the insurance company's motion for summary judgment on all claims and denies the plaintiff's motion for partial summary judgment on all claims.

## I. PROCEDURAL HISTORY

On September 6, 2019, Jessica Niles brought a civil action for personal injury damages against Eric Motsenbocker in York County Superior Court. *Jt. R.*, Attach.

2, *Superior Ct. Compl.* (ECF No. 19) (*Compl.*).  Mr. Motsenbocker, through counsel, reported the suit to his insurance company Travelers Home and Marine Insurance Company[1] (Travelers) and requested that Travelers assume the defense.  *Jt. Stipulated Facts* ¶ 7 (ECF No. 19) (*JSF*).  Travelers denied Mr. Motsenbocker's request on the ground that the claim was not covered by the applicable insurance policy.  *JSF* ¶ 8.  A stipulated judgment was entered in the personal injury action in favor of Ms. Niles and against Mr. Motsenbocker in the amount of $150,000 with prejudice and without costs.  *First Am. Compl.* ¶¶ 9-11 (ECF No. 10) (*Am. Compl.*).  By virtue of an Assignment of Rights and Claims, Mr. Motsenbocker assigned to Ms. Niles all causes of action available to him under the relevant insurance policy through Travelers, including but not limited to causes of action relating to Travelers' duty to provide Mr. Motsenbocker with a defense and indemnification in relation to Ms. Niles' action for personal injury damages.  *Id.* ¶ 12.

On August 26, 2021, Ms. Niles filed a complaint against Travelers in Maine state court alleging breach of contract for failure to defend and indemnify Mr. Motsenbocker and to assert her alleged right to reach and apply the policy toward satisfaction of the state court judgment.  *State Ct. R. and Aff. By Travelers Casualty and Surety Company*, Attach 2, *Pl.'s Compl.* (ECF No. 3).  On September 13, 2021,

---

[1]    Ms. Niles originally filed suit against Travelers Casualty and Surety Company.  *Aff. of Jonathan Dunitz*, Attach. 2, *Compl.* ¶ 2.  In its September 13, 2021 answer, Travelers Home and Marine Insurance Company affirmatively asserted that it was "improperly named" as Travelers Casualty and Surety Company.  *Answer* at 1 (ECF No. 4).  On October 14, 2021, Ms. Niles filed an amended complaint in which she alleged that Travelers Home and Marine Insurance Company was the proper Defendant.  *First Am. Compl.* ¶¶ 2, 7 (ECF No. 10).  In its October 22, 2021 answer to the first amended complaint, Travelers Home and Marine Insurance Company admitted it issued a homeowners insurance policy insuring Eric Motsenbocker.  *Answer to Pl.'s First Am. Compl.* ¶ 7 (ECF No. 12).  In referring to Travelers, the Court refers to Travelers Home and Marine Insurance Company.

Travelers removed the case to this Court. *Notice of Removal* (ECF No. 1). On October 14, 2021, Ms. Niles filed an amended complaint. *First Am. Compl.* (ECF No. 10) (*Am. Compl.*). On October 22, 2021, Travelers filed its answer to Ms. Niles' amended complaint. *Am. Answer to Am. Compl.* (ECF No. 12) (*Answer*).

On March 11, 2022, Travelers filed its motion for summary judgment and statement of material facts. *Def. Travelers Home and Marine Insurance Company's Mot. for Summ J. and Mem. of Law* (ECF No. 20) (*Def.'s Mot.*). On the same day, Ms. Niles filed her motion for partial summary judgment, *Pl.'s Mot. for Partial Summ. J. with Incorporated Mem. of Law* (ECF No. 21) (*Pl.'s Mot.*), and her statement of material facts. *Pl.'s Statement of Material Facts* (ECF No. 22) (PSMF). On April 8, 2022, Ms. Niles filed her opposition to Travelers' motion for summary judgment. *Mem. in Opp'n to Def.'s Mot. for Summ. J.* (ECF No. 25) (*Pl.'s Opp'n*). On the same day, Travelers filed its opposition to Ms. Niles' motion for partial summary judgment and its response to Ms. Niles' statement of material facts. *Def.'s Resp. to Pl.'s Statement of Material Facts* (ECF No. 26) (DRPSMF); *Def. Travelers Home and Marine Insurance Company's Opp'n to Pl.'s Mot. for Partial Summ. J.* (ECF No. 27) (*Def.'s Opp'n*).

On April 29, 2022, Travelers filed its reply. *Def. Travelers Home and Marine Insurance Company's Reply in Supp. of Summ J.* (ECF No. 28) (*Def.'s Reply*). On the same day, Ms. Niles filed her reply. *Pl.'s Reply in Support of Her Mot. for Partial Summ. J* (ECF No. 29) (*Pl.'s Reply*).

## II.    THE FACTS

### A.    The Underlying Action and Factual Background

In the state court complaint underlying this action, Ms. Niles alleged that Mr. Motsenbocker secretly recorded videos of her in the bathroom of an apartment she rented from him. *Compl.* ¶¶ 1-22. Throughout the entirety of Ms. Niles' time as a tenant at the apartment, an electronic weather station device ("weather station") was mounted to the wall in the bathroom, opposite the shower and toilet. *Id.* ¶ 8. The weather station displayed, among other things, the temperature and humidity inside the bathroom. *Id.* ¶ 9. As Ms. Niles later discovered, the weather station also contained a video camera linked to a motion sensor such that it filmed whenever it detected motion in the bathroom. *Id.* ¶ 10. Ms. Niles alleged upon information and belief that Mr. Motsenbocker installed the weather station onto the bathroom wall. *Id.* ¶ 11.

On or about July 31, 2019, Tiffany Smith—another tenant at the apartment— was evicted from the property. *Id.* ¶ 12. Approximately two weeks before Ms. Smith was evicted, Mr. Motsenbocker removed the weather station from the bathroom wall, stating that he was concerned Ms. Smith would attempt to take it with her when she vacated the building. *Id.* ¶ 13. When Ms. Smith vacated the building, she took the bathroom shower curtain with her. *Id.* ¶ 14. Later that day, Mr. Motsenbocker returned and re-installed the weather station onto the bathroom wall. *Id.* ¶ 15. Ms. Niles informed Mr. Motsenbocker that Ms. Smith had taken the bathroom shower curtain with her, and Mr. Motsenbocker insisted on purchasing a new shower curtain for the bathroom. *Id.* ¶ 16. Ms. Niles accompanied him to Lowe's Home Improvement, where Mr. Motsenbocker was adamant that he purchase a clear

4

shower curtain, claiming that it would allow him to detect any presence of mold.  *Id.* ¶ 17.  Ms. Niles had lived in the apartment for approximately three months when Ms. Smith was evicted.  PSMF ¶ 1.[2]

Ms. Niles alleged that she became suspicious of Mr. Motsenbocker because he had mounted the weather station device on the bathroom wall in the apartment opposite the shower and adamantly insisted that the tenants use a clear shower curtain.  *Compl.*  ¶¶ 11, 16-18.  Ms. Niles and another tenant inspected the weather station and discovered a "Secure Digital" (SD) memory card in the weather station storing twenty-two videos of the tenants showering, using the toilet, and changing their clothes over the course of the previous three days after Mr. Motsenbocker had re-installed the device.  *Id.* ¶¶ 18-19.  She alleged that Mr. Motsenbocker downloaded all previous videos saved on the SD card before re-installing the weather station in order to keep them in his possession when Ms. Smith left.  *Id.* ¶ 21.  Ms. Niles alleged that Mr. Motsenbocker intentionally recorded videos of her and the other tenants throughout the entirety of their time living in the apartment.  *Id.* ¶ 20.  She is unaware of what Mr. Motsenbocker did with the videos he took of her or whether anyone else has seen those videos.  *Id.* ¶ 22.

In September 2019, Ms. Niles sued Mr. Motsenbocker for invasion of privacy and intentional infliction of emotional distress.  *JSF* ¶ 6.  Count I of the underlying

---

[2]     Travelers objects to all of the facts provided in Ms. Niles' statement of facts, arguing that "they should be stricken pursuant to Local Rule 56(e) and Federal Rule of Evidence 403 on the grounds that [they] are needlessly cumulative."  *See* DRPSMF ¶¶ 1-16.  The Court treats Travelers' objections as qualifications and omits only fully duplicative facts from its summary judgment order.

complaint alleged that Mr. Motsenbocker "intentionally and unreasonably intruded upon the solitude of Plaintiff while she was in the bathroom" and that this "intrusion would be highly offensive to a reasonable person." *Compl.* ¶¶ 24-25. The complaint alleged that "[a]s a direct and proximate result of Defendant's invasion of Plaintiff's privacy, Plaintiff has suffered damages, including emotional distress." *Id.* ¶ 26. The complaint further alleged that Mr. Motsenbocker's actions were undertaken "with malice, or are so egregious that malice may be implied." *Id.* ¶ 27.

Count II of the underlying complaint alleged that Mr. Motsenbocker "intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from his conduct." *Id.* ¶ 29. It alleged that Mr. Motsenbocker's conduct "was so extreme or outrageous as to exceed all possible bounds of decency and must be regarded as atrocious and utterly intolerable in a civilized community." *Id.* ¶ 30. It alleged that his actions "directly and proximately caused Plaintiff's emotional distress—including, *inter alia*, humiliation, fear, paranoia, and anxiety—which was so severe that no reasonable person could be expected to endure it." *Id.* ¶ 31. It alleged that Mr. Motsenbocker's actions were undertaken "with malice, or are so egregious that malice may be implied." *Id.* ¶ 32. Although Plaintiff alleged that she suffered damages as a result of Mr. Motsenbocker's invasion of her privacy, she did not assert that he intended to cause those damages. PSMF ¶ 7.

Mr. Motsenbocker, through counsel, notified Travelers of the lawsuit and requested a defense. *JSF* ¶ 7; *see id.*, Attach 3, *Letter Requesting Defense*. Travelers

denied both a defense and indemnification on the ground that the claim was not covered by the policy. *JSF* ¶ 8; *see id.*, Attach 4, *Denial of Coverage*;[3] PSMF ¶ 13.

### B.   The Present Action

Ms. Niles alleges that she received a judgment against Ms. Motsenbocker in the amount of $150,000 and payment of $26,474.26 towards satisfaction of the judgment. *Notice of Removal* at 2.  In July 2021, Mr. Motsenbocker assigned to Ms. Niles his rights and claims against Travelers including but not limited to claims relating to the duty to defend, the duty to indemnify, and for amounts paid by Mr. Motsenbocker in partial satisfaction of Ms. Niles' claims. *JSF* ¶ 9.  Ms. Niles now brings suit against Travelers individually and as Mr. Motsenbocker's assignee to seek full satisfaction of the judgment against Mr. Motsenbocker. *Notice of Removal* at 1-2.

### C.   The Homeowners Policy

Travelers issued homeowner's policy No. 600942755 633 1 (the Policy) to Mr. Motsenbocker on an apartment building in Sanford, Maine, effective July 2019 to July 2020. *JSF* ¶ 1; *see id.*, Attach 1, *Travelers Policy* (*Policy*).  The Policy incorporates forms HO-3 (10-06): Homeowners 3- Special Form and HO-300 ME (05-17): Special Provisions – Maine. JSF ¶ 2.

Section II – LIABILITY COVERAGES, set forth in HO-3 as modified by HO-300 ME, states in relevant part:

COVERAGE E – PERSONAL LIABILITY

---

[3]      Although Travelers originally relied also on the business pursuit exclusion to defend itself, Travelers does not rely in this case on the business pursuit exclusion referenced in the denial letter. *See Denial of Coverage* at 5.

If a claim is made or a suit is brought against an "insured" for damages because of "bodily injury" or "property damage" caused by an "occurrence" to which this coverage applies, we will:

1.   Pay up to our limit of liability for the damages for which an "insured" is legally liable; and

2.   Provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent. We may investigate and settle any claim or suit that we decided is appropriate.  Our duty to settle or defend ends when our limit of liability for the "occurrence" is exhausted by the payment of a judgment or settlement.

JSF ¶ 3; PSMF ¶10.  The Policy contains the following definitions in HO-3:

2.   "Bodily injury" means bodily harm, sickness or disease, including required care, loss of services and death that results.
. . .

10.   "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results during the policy period, in:

a. "bodily injury"; or
b. "property damage".

JSF ¶ 4; PSMF ¶ 11.  The Policy further provides in relevant part under SECTION

II – EXCLUSIONS in HO-3 as modified by HO-300 ME:

A. Coverage E – Personal Liability and Coverage F – Medical Payments to Others.  Coverages E and F do not apply to "bodily injury" or "property damage":

1.   Which is intended or reasonably expected by an "insured" even if the resulting "bodily injury" or "property damage":

a. Is of a different kind, quality or degree than a reasonable person would have expected or intended; or

8

> b. Is sustained by a different person, entity, real or personal property, than a reasonable person would have expected or intended.

> Exclusion A.1 does not apply to "bodily injury" resulting from the use of reasonable force by an "insured" to protect persons or property.

JSF ¶ 5; PSMF ¶ 12.

## III.   THE PARTIES' POSITIONS

### A.   Travelers' Motion for Summary Judgment

#### 1.   Duty to Defend

Travelers first submits that "Ms. Niles, as the assignee of the Insured, cannot meet the burden of proving that coverage exists for the claims in the underlying complaint" because "[t]he heinous, intentional conduct of a landlord invading his tenant's privacy by secretly installing a video camera in the bathroom of the leasehold is not a covered occurrence because it is not an accident." *Def.'s Mot.* at 8.  Travelers observes that "[t]he underlying complaint alleges that [Mr.] Motsenbocker's voyeurism was intentional, not accidental" and "[t]he unambiguous language of [the] Policy covers only accidents." *Id.*

Travelers contends that "[a]lthough whether video voyeurism is a covered occurrence is apparently an issue of first impression in Maine, numerous courts have sensibly concluded that emotional distress resulting from the use of hidden cameras is not 'accidental,' and therefore not a covered 'occurrence,'" *id.* at 9 (collecting cases), and "[t]o hold that the inevitable distress resulting from [Mr. Motsenbocker's] intentional acts was 'accidental' 'stretches the plain meaning of that word too far.'"

*Id.* at 10 (citing *Allocca v. York Ins. Co. of Maine*, 2017 ME 186, ¶ 17, 169 A.3d 938, 942, as revised (Nov. 30, 2017) (declining to consider whether a loss resulted from an "accident" from the perspective of the insured where the conduct was "indisputably deliberate and not accidental")).

### 2.     The "Intentional Acts" Policy Exclusion

Travelers contends that "[a]ssuming, arguendo, that the underlying complaint alleges an occurrence, the claims are excluded under [an intentional acts] policy exclusion . . . because they allege intentional torts, the natural consequence of which is to cause emotional distress." *Id.* at 11. Travelers insists that "[d]ue to the egregious nature of the Insured's conduct as alleged in the underlying complaint, Ms. Niles' emotional distress in this case could not have been 'unanticipated' or unintended." *Id.* at 9. According to Travelers, Mr. "Motsenbocker's conduct was no accident. He did exactly what he intended to do when he installed a camera in his tenants' bathroom. The injuries that followed were not 'an unanticipated event.'" *Id.* at 11 (citing *Vigna v. Allstate Ins. Co.*, 686 A.2d 598, 600 (Me. 1996)). Travelers asserts the fact that Mr. Motsenbocker "got caught was the only unexpected or unintended event," and "[a]s a result, there was no 'occurrence' within the meaning of the Travelers Policy, Travelers had no duty to defend, and summary judgment should be granted in its favor." *Id.*

Travelers submits that the policy exclusion here "is analogous to the policy exclusion in *Wallace v. Allstate Ins[urance] Co[mpany]*, [No. CV-02-008,] 2003 WL 21018821 [,2003 Me. Super. LEXIS 63] (Me. Super. Apr. 18, 2003), which barred coverage for bodily injury 'intended by, or which may reasonably be expected to result

from the intentional or criminal acts or omissions of, any [insured] person.'" *Def.'s Mot.* at 11-12 (quoting *Wallace*, 2003 WL 21028821, at *2).  According to Travelers, "[r]egardless of whether an objective or subjective standard is applied, the claims against Motsenbocker are excluded under the policy because, as explained below, the intentional, nonconsensual conduct giving rise to the emotional distress claims, 'simply cannot support recovery for anything other than bodily injury that is 'expected or intended by the insured,' and therefore excluded from the policy.'"  *Id.* at 13 (quoting *Concord Gen. Mut. Ins. Co. v. Hale*, 952 F. Supp. 31, 32 (D. Me. 1997)). Travelers further submits that Mr. "Motsenbocker's nonconsensual filming of his tenant showering, changing her clothing, and using the toilet in her bathroom was so likely to cause emotional distress that 'the intent to commit the act inherently carries with it the intent to cause the resulting injury.'"  *Id.* at 16 (quoting *Landry v. Leonard*, 1998 ME 241, ¶¶ 8-9, 720 A.2d 907, 909)).

### 3.    Public Policy

Travelers submits that "[r]equiring insurers to provide a defense for the kind of intentional conduct alleged here raises serious policy implications" because "[t]he allegations in the underlying complaint demonstrate that Motsenbocker's violation of privacy is a crime in Maine . . . [and] '[t]he general rule is that it is against public policy for insurance to indemnify an insured against his own criminal acts.'"  *Id.* at 17 (quoting *Landry*, 1998 ME 241 ¶ 11, 720 A.2d 907).  Travelers observes that "a ruling that Travelers had a duty to defend Motsenbocker because he did not subjectively intend or subjectively foresee the harm resulting from his conduct could

lead to a rule requiring insurers to defend against a host of intentional acts simply because the insured claims that he or she did not intend the result or for the victim to uncover the wrongdoing." *Id.* at 17 (quotation marks omitted).

### 4.   Duty to Indemnify and Reach and Apply Claims

Finally, Travelers concludes that because it "had no duty to defend Motsenbocker in Niles' lawsuit, it likewise had no duty to indemnify him." *Id.* at 18. Travelers asserts that "the claims against Motsenbocker fall outside the Travelers policy, [and a]ccordingly, Niles cannot 'reach and apply' the policy to satisfy her judgment against Motsenbocker." *Id.* at 19.

### B.   Jessica Niles' Opposition

### 1.   Duty to Defend

Ms. Niles submits that Travelers' argument that Mr. Motsenbocker's actions are not a covered occurrence "is flawed . . . because 'the accidental nature of an event for purposes of a standard liability insurance contract does not derive from the voluntariness of the *act*, but rather from the unintentional nature of the *consequences flowing from the act.*'" *Pl.'s Opp'n* at 2 (quoting *Me. Mut. Fire Ins. Co. v. Gervais*, 1998 ME 197, ¶ 10, 715 A.2d 938) (emphasis in *Pl.'s Opp'n*).

She further submits that "the inquiry is not, as [Travelers] claims, whether the complaint alleged an intentional tort," but instead whether "Motsenbocker *intended the damage that Plaintiff ultimately suffered.*" *Id.* at 3 (emphasis in *Pl.'s Opp'n*). According to Ms. Niles, because she "did not assert that Mr. Motsenbocker 'intended to cause' those damages—indeed, it is likely that [he] intended she *never* find the

camera in the bathroom, and thus could not have intended her to suffer damages—
Maine law dictates that Mr. Motsenbocker's actions be considered 'accidental' for
purposes of this analysis." *Id.* (*emphasis in Pl.'s Opp'n*).

According to Ms. Niles, Travelers fails to contemplate the "*potential* that facts
ultimately proved could result in coverage." *Id.* at 4 (citing *Mitchell v. Allstate Ins.
Co.*, 2011 ME 133, ¶ 10, 36 A.3d 876 (emphasis in *Mitchell*)).  Ms. Niles relies on
*Mitchell* to assert that the Court should take into consideration any possible facts
that would lead to coverage because "[a]n insured's entitlement to a defense does not
hinge on how harsh the plaintiff chooses to be in characterizing the defendant's
conduct . . . [t]he sole question is whether the tort that is alleged can be established
on the facts actually proven at trial without proving non-coverage." *Id.* at 6.

In response to Travelers' public policy argument, Ms. Niles contends that "[t]o
the extent [Travelers seeks] to use this case to establish that *no* duty to defend can
arise where a plaintiff alleged IIED and invasion of privacy based on video voyeurism
. . . such an argument would [only] have been appropriate in state court, not federal
court [and s]uch public policy considerations are of no moment in this dispute,
especially when it already is established Maine law that IIED and invasion of privacy
are not torts for which a per se rule of 'no coverage' applies."  *Id.* at 7 (emphasis in
*Pl.'s Opp'n*).

## C.   Travelers' Reply

According to Travelers, Ms. Niles' claim that "the underlying complaint alleges
an 'accident' because the insured . . . intended she never find the camera in the

bathroom, and thus could not have intended her to suffer damages . . . is preposterous." *Def.'s Reply* at 1.  Travelers submits that "the only 'accident' was Motsenbocker's inability to keep his video voyeurism a secret" and "[t]he 'accidental' discovery of Motsenbocker's nonconsensual recording of his tenants in their leasehold's bathroom does not convert the injuries caused by his intentional conduct into a covered 'occurrence.'"  Id. at 1-2.

Travelers contends that caselaw does "not require, as Plaintiff argues . . . that a complaint must allege that an injury was 'intended'—as opposed to 'anticipated'— to place it outside the scope of an 'accident.'"  Id. at 3.  Travelers concludes that Ms. Niles "drafted the underlying complaint [and] accepted assignment of Motsenbocker's purported insurance claims instead of seeking a judgment against him," id. at 6, and "finding coverage on the grounds that Motsenbocker did not intend to get caught offends public policy."  Id. at 7.

### D.   Jessica Niles' Motion for Partial Summary Judgment

#### 1.   Duty to Defend

Ms. Niles first submits that "Travelers had an obligation to defend Mr. Motsenbocker in the civil action commenced against him by Plaintiff."  *Pl.'s Mot.* at 5.  Ms. Niles cites *Burka v. Garrison Property & Cas[ualty] Ins[urance] Co[mpany]*, 521 F. Supp. 3d 97, 102 (D. Me. 2021) and explains how "this [c]ourt reasoned that 'the accidental nature of an event for purposes of a standard liability insurance contract does not derive from the voluntariness of the *act*, but rather from the unintentional nature of the *consequences flowing from* the act.'"  *Id.* at 8 (quoting *Burka* at 103) (emphasis in original).  Ms. Niles insists that although she "alleged

14

that Mr. Motsenbocker intended to invade her privacy by placing a camera in the bathroom, she did not assert that he intended her to suffer severe emotional distress as a result of that invasion of her privacy." *Id.* She asserts that "common sense dictates that inherent to such a surreptitious act is the intent by the tortfeasor *not to be discovered*, and thus not to inflict *any* injury upon the alleged victim whatsoever." *Id.* at 8-9 (emphasis in *Pl.'s Mot.*).

She contends that she "could have established IIED by proving that Mr. Motsenbocker only '*recklessly* inflicted severe emotional distress,' and did not need to establish that Mr. Motsenbocker intended or 'reasonably expected' that she would suffer damages as a result." *Id.* at 9.

Ms. Niles observes how Mr. "Motsenbocker could be liable if he did not install the camera, but was negligent or reckless in not discovering it or in failing to remove it," and moreover the "complaint does not foreclose the possibility that Motsenbocker suffered from mental conditions that have a bearing on the coverage issues, but would not completely relieve him of liability to Niles." *Id.* at 10. She explains that "[g]iven the innumerable unknowns, the potential certainly existed that the facts ultimately proved may come within the coverage." *Id.* (citation and quotation marks omitted). According to Ms. Niles, because this is "a factual basis for recovery that could have been developed at trial and would have obligated Travelers to pay under the policy, Plaintiff is entitled to partial summary judgment in her favor." *Id.*

### E.   Travelers' Opposition

### 1.   Duty to Defend

Travelers submits that Ms. Niles "cannot carry her burden to show that the underlying lawsuit alleged an 'occurrence' for which Travelers' policy provided coverage, *Def.'s Opp'n* at 1, because "[a] duty to defend exists only if the allegations of the complaint demonstrate a potential basis for recovery under the policy."  *Id.* at 2.

Travelers submits that "[t]his Court admonishes that the duty to defend 'cannot be triggered by pure speculation as to conduct or causes of action that are not either set forth in, or fairly suggested by, the allegations of the complaint.'"  *Id.* at 3 (quoting *Prime Tanning Co. v. Liberty Mut. Ins. Co.*, 750 F. Supp. 2d 198, 208 (D. Me. 2010)).  Travelers posits that "[i]nstead, the Court must 'confine [its] examination to the language of the underlying complaint,' and cannot premise the duty to defend on 'some action or hidden defect or condition unmentioned in the complaint.'"  *Id.* (quoting *Barnie's Bar & Grill, Inc. v. United States Liab. Ins. Co.*, 2016 ME 181, ¶¶ 7, 9, 152 A.3d 613, 616 as corrected (Mar. 23, 2017)).

According to Travelers, Ms. Niles "overstates the holding of *Mitchell*," *Def.'s Opp'n* at 4, because "either scenario in *Mitchell* would have been consistent with that underlying complaint as the court described it."  *Id.* at 5.  Travelers asserts this is not the case here because "[a] duty to defend cannot be premised on a factual scenario that 'fundamentally changes the allegations of the complaint.'"  *Id.* (quoting *Iasbarrone v. First Fin. Ins. Co.*, 2013 WL 3166342, at *2 (D. Me. June 20, 2013), *aff'd* (1st Cir. July 22, 2014)).  Travelers further asserts that Ms. Niles' reliance on *Burka* is misplaced and that the holding in *Burka* "does not mean—as Plaintiff suggests—

that all damages are the result of 'accidents' within the policy coverage unless they were specifically intended." *Id.* at 8.

Travelers contends that Ms. Niles "erroneously assumes that an intention to avoid getting caught somehow converts the consequences of [Mr. Motsenbocker's] conduct into an accident" when "[i]n reality, the fact that he did not want to be discovered shows that he anticipated and, in fact, *knew* that his conduct would cause harm when discovered." *Id.* at 9 (emphasis in *Def.'s Opp'n*).

Travelers further contends that Ms. Niles "cannot manufacture an 'accident' by speculating about facts that contradict the allegations in her complaint" and that "[Ms. Niles]' hypotheticals—that *someone else* installed a hidden camera in the apartment that Motsenbocker owned, or that Motsenbocker was unaware that he was secretly filming his tenants—run directly counter to her own pleadings." *Id.* at 11 (emphasis in *Def.'s Opp'n*).  Travelers explains that "Plaintiff's own allegations in the underlying complaint undermine any suggestion that someone else installed the camera or that Motsenbocker was unaware that he was secretly filming his tenants" and because Ms. Niles'  "attempt to recast Motsenbocker as merely negligent is diametrically opposed to her allegations that Motsenbocker *intentionally* invaded her privacy and *intentionally* inflicted emotional distress . . . [s]he cannot back away from her allegations now and propose an entirely different factual basis for her claims." *Id.* at 12 (emphasis in *Def.'s Opp'n*).  According to Travelers, "this Court must disregard Plaintiff's argument that Travelers has a duty to defend because the facts at trial may prove that Mr. Motsenbocker was merely negligent or reckless," *id.*,

17

because Ms. Niles "did not plead negligence in the underlying complaint" and her "attempt to recast Motsenbocker's conduct as merely reckless contradicts her own allegations demonstrating that he acted intentionally." *Id.* at 13-14.

Finally, in response to Ms. Niles' contention that Mr. Motsenbocker may have suffered from mental conditions that have a bearing on the coverage issue, Travelers asserts "[i]t cannot be the rule that Travelers has a duty to defend if the complaint does not foreclose the possibility that the insured has some mental illness that could bear on intent, where there is absolutely nothing in the complaint that would suggest such a thing." *Id.* at 14 (internal quotations omitted).

### F.    Jessica Niles' Reply

#### 1.    Duty to Defend

Ms. Niles submits that "this Court may hypothesize facts consistent with the causes of action pled," *Pl.'s Reply* at 1, because "Plaintiff's complaint asserted claims for intentional infliction of emotional distress ("IIED") and invasion of privacy: claims that could be proven if Mr. Motsenbocker *recklessly* inflicted severe emotional distress" or did not reasonably or sufficiently foresee that Ms. Niles would discover "his alleged voyeurism or suffer emotional distress as a result." *Id.* at 3 (emphasis in *Pl.'s Reply*). Ms. Niles further submits that "[a]lthough Plaintiff characterized Mr. Motsenbocker's conduct in the most reprehensible terms possible, those claims could have been successful at trial without Mr. Motsenbocker *intending* to inflict the emotional distress that Plaintiff ultimately suffered . . . [so] the Court here would not improperly speculate about unpled causes of action by recognizing the possibility of facts that could come within coverage." *Id.* (emphasis in *Pl.'s Reply*). Ms. Niles insists

that "the facts established at trial could result in liability not predicated on Mr. Motsenbocker's intentional conduct, and this Court should therefore enter partial summary judgment in Plaintiff's favor." *Id.* at 4.

Finally, regarding the "intended or reasonably expected" policy exclusion, Ms. Niles contends that "[a]lthough Defendant may be correct in contending that it is reasonable for a tenant to suffer emotional distress *if she discovers* such surreptitious filming, *that is not the standard set forth by the policy exclusion*: rather, the reasonableness standard applies to an insured's expectations, and *not* to the measure of a claimant's damages." *Id.* at 6 (emphasis in *Pl.'s Reply*). Ms. Niles therefore argues that "the facts pleaded in the complaint do not foreclose 'a potential or a possibility' for a jury to find that Mr. Motsenbocker's actions—prior to, during, and after allegedly placing a secret camera in the bathroom—were sufficiently covert, such that he reasonably would not have expected Plaintiff to discover his alleged voyeurism and therefore to have suffered any resulting emotional damages." *Id.* Ms. Niles concludes that "[b]ecause it is not apparent from the face of the complaint that Mr. Motsenbocker should have 'reasonably expected' Plaintiff to discover the alleged hidden camera and suffered damages as a result, partial summary judgment is appropriate." *Id.* at 7.

## IV.   LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Genuine issues of fact are those that a factfinder could resolve in favor of the nonmovant, while material facts are those whose 'existence or

nonexistence has the potential to change the outcome of the suit.'" *Green Mountain Realty Corp. v. Leonard*, 750 F.3d 30, 38 (1st Cir. 2014) (quoting *Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011)).

When the movant "has made a preliminary showing that there is no genuine issue of material fact, the nonmovant must 'produce specific facts, in suitable evidentiary form, to . . . establish the presence of a trialworthy issue.'" *McCarthy v. City of Newburyport*, 252 F. App'x 328, 332 (1st Cir. 2007) (alteration in original) (quoting *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999)). The nonmoving party must provide "'enough competent evidence' to enable a factfinder to decide in its favor on the disputed claims." *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002) (quoting *Goldman v. First Nat'l Bank of Bos.*, 985 F.2d 1113, 1116 (1st Cir. 1993)). Then, a "court views the facts and draws all reasonable inferences in favor of the nonmoving party," *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011), but disregards "[c]onclusory allegations, improbable inferences, acrimonious invective, or rank speculation." *Mancini v. City of Providence ex rel. Lombardi*, 909 F.3d 32, 38 (1st Cir. 2018) (quoting *Ahern v. Shinseki*, 629 F.3d 49, 54 (1st Cir. 2010)). "[T]he plain language of Rule 56(c) mandates entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Where, as here, the parties have filed cross-motions for summary judgment, the court must evaluate each motion independently and "determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Matusevich v. Middlesex Mut. Assurance Co.*, 782 F.3d 56, 59 (1st Cir. 2015) (citing *Barnes v. Fleet Nat'l Bank, N.A.*, 370 F.3d 164, 170 (1st Cir. 2004)). As such, for cross-motions for summary judgment, the standard of review is applied to each motion separately. *Libertarian Party of New Hampshire v. Gardner*, 759 F. Supp. 2d 215, 221 (D.N.H. 2010), *aff'd*, 638 F.3d 6 (1st Cir. 2011). The presence of cross-motions for summary judgment "does not alter or dilute" the summary judgment standard. *Id.* (citing *Kunelius v. Town of Stow*, 588 F.3d 1, 8 (1st Cir. 2009)).

## V.    DISCUSSION

### A.    Duty to Defend

Ms. Niles[4] claims that Travelers breached its contract with Mr. Motsenbocker when it denied a defense to him. Travelers asserts that because there was nothing accidental about Mr. Motsenbocker's actions or unpredictable about the resulting harm to Ms. Niles, Travelers had no duty to defend the claims assigned to Ms. Niles by Mr. Motsenbocker.

#### 1.    Legal Standard

When evaluating whether an insurer has a duty to provide a defense to its insured, Maine has adopted the so-called "pleading comparison test." *Penney v.*

---

[4]      As noted earlier, Mr. Motsenbocker assigned Ms. Niles all causes of action available to him under the Policy when he signed an Assignment of Rights and Claims. Furthermore, the parties stipulated to a judgment in favor of Ms. Niles in her 2019 York County Superior Court civil action for personal injury damages.

*Capitol City Transfer*, 1998 ME 44, ¶ 6, 707 A.2d 387, 389.   "We determine the duty to defend by comparing the allegations in the underlying complaint with the provisions of the insurance policy." *Id.* ¶ 4 (quoting *Vigna*, 686 A.2d 598, 599 (Me. 1996)); *Mitchell*, 2011 ME 133, ¶ 9, 36 A.3d 876, 879 ("To determine whether an insurer has a duty to defend, we compare the allegations of the underlying complaint with the coverage provided in the insurance policy").

The Maine Supreme Judicial Court has consistently reinforced the "policy comparison test" to the exclusion of extrinsic evidence. *Cox v. Commonwealth Land Title Ins. Co.*, 2013 ME 8, ¶ 9, 59 A.3d 1280, 1283 ("Regardless of extrinsic evidence, if the complaint—read in conjunction with the policy—reveals a mere *potential* that the facts may come within the coverage, then the duty to defend exists") (emphasis in original); *York Ins. Group v. Lambert*, 1999 ME 173, ¶ 5, 740 A.2d 984, 985 ("Lambert contends that the court erred when it looked beyond the pleadings and considered evidence extrinsic to the complaint. We agree."); *Elliott*, 1998 ME 138, ¶ 7, 711 A.2d at 1312; *Penney*, 1998 ME 44, ¶ 5, 707 A.2d at 388-89; *Patrons Oxford Mut. Ins. Co. v. Garcia*, 1998 ME 38, ¶¶ 5-8, 707 A.2d at 385-86; *Travelers Indem. Co v. Dingwell*, 414 A.2d 220, 227 (Me. 1980).   "[A]n insurer must provide a defense if there is any *potential* that facts ultimately proved could result in coverage." *Barnie's Bar & Grill, Inc.*, 2016 ME 181, ¶ 10, 152 A.3d 613, 615 (emphasis in original). Furthermore, "[a]ny ambiguity in the policy regarding the insurer's duty to defend is resolved against the insurer, . . . and policy exclusions are construed strictly against the insurer." *Mitchell*, 2011 ME 133, ¶ 13, 36 A.3d 876 (internal citations omitted).

"Our body of case law should not, however, be misread as obliging courts to conjure the duty to defend from speculation or supposition." *Id.* ¶ 6; *see York Golf & Tennis Club v. Tudor Ins. Co.*, 2004 ME 52, ¶ 8, 845 A.2d 1173 ("[In determining the duty to defend,] we do not speculate about causes of action that were not stated"); *see also* 14 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 200:19 at 200-33 (3d ed. 2005) (stating that the duty to defend "cannot be triggered by mere speculation that additional facts or causes of action will be developed at a later time"). Although the duty to defend is broad, "[a]n insurer may properly refuse to defend a policyholder if the allegations of the complaint fall entirely within a policy exclusion." *Mitchell*, 2011 ME 133, ¶ 13, 36 A.3d 876.

### 2. Analysis

The Court first turns to the language of the Policy and the underlying complaint, *Penney*, 1998 ME 44, ¶ 4, 707 A.2d at 388 ("We determine the duty to defend by comparing the allegations in the underlying complaint with the provisions of the insurance policy") (internal citations omitted), and it addresses the questions of coverage and the "intended or reasonably expected acts" exclusion together. *See Burka*, 521 F. Supp. 3d at 103 ("Although coverage and exclusion are two separate issues, I find it convenient to deal with coverage and the 'expected or intended' exclusion together").

The Policy defines an "occurrence" to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results during the policy period, in . . . bodily injury . . . or . . . property damage," and

23

it excludes "bodily injury or property damage . . . which is intended or reasonably expected" by the insured. *JSF* ¶¶ 4-5. Ms. Niles' underlying complaint provides that "[u]pon information and belief, [Mr. Motsenbocker] installed the [w]eather [s]tation onto the bathroom wall," *Compl.* ¶ 11, and then "re-installed the [w]eather [s]tation onto the bathroom wall" after temporarily removing it during the eviction of another tenant. *Id.* ¶ 15. According to the underlying complaint, when Ms. Niles notified Mr. Motsenbocker that the evicted tenant had taken the shower curtain with her, Mr. Motsenbocker "insisted on purchasing a new shower curtain for the bathroom . . . [Ms. Niles] accompanied him to Lowe's Home Improvement to do so . . . [and Mr. Motsenbocker was] adamant that he purchase a clear shower curtain, claiming that it would allow him to detect any presence of mold." *Id.* ¶¶ 16-17.

On the first count—invasion of privacy—Ms. Niles alleged that Mr. Motsenbocker "intentionally and unreasonably intruded upon the solitude of Plaintiff while she was in the bathroom." *Id.* ¶ 24. She asserted that his "actions were undertaken with malice, or are so egregious that malice may be implied." *Id.* ¶ 27. On the second count—intentional infliction of emotional distress—Ms. Niles alleged that Mr. Motsenbocker "intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from his conduct." *Id.* ¶ 29. She likewise asserted that his "actions were undertaken with malice, or are so egregious that malice may be implied. *Id.* ¶ 32.

Ms. Niles argues that Mr. Motsenbocker's conduct is an "occurrence" because "'the accidental nature of an event for purposes of a standard liability insurance

24

contract does not derive from the voluntariness of the *act*, but rather from the unintentional nature of the consequences flowing from the act.'" *Pl.'s Opp'n* at 2 (quoting *Me. Mut. Fire Ins. Co.*, 1998 ME 197, ¶ 10, 715 A.2d 938). More recently, however, the Law Court concluded that "describing an intentional act . . . as an 'accident' stretches the plain meaning of that word too far." *Allocca*, 2017 ME 186 ¶ 17, 169 A.3d 938. The Law Court instead found "it more persuasive the contrary view . . . that the plain and commonly understood meaning of an 'accident' is an unexpected event" and "[t]hat the insured himself may have been unsuspecting does not transform the intentional act . . . into an accident." *Id.* (citing *Kelley v. N. E. Ins. Co.*, 2017 ME 166, ¶ 7, 168 A.3d 779); *but see Burka*, 521 F. Supp. 3d at 104-05; *Gibson v. Farm Family Mut. Ins. Co.*, 673 A.2d 1350, 1353 (Me. 1996); *Burns v. Middlesex Ins. Co.*, 558 A.2d 701, 702-03 (Me. 1989).

As this is a matter of state law, as it is required to do, this Court accepts the Law Court's reasoning in *Allocca* and concludes that defining Mr. Motsenbocker's behavior—as alleged in Ms. Niles' underlying complaint—as an accident "stretches the plain meaning of that word too far" and his acts do not constitute a covered occurrence.

The Court nonetheless addresses the question of exclusion. Ms. Niles urges the Court to apply a subjective standard to the policy exclusion and to conclude that Mr. Motsenbocker's conduct was not expected because Mr. Motsenbocker himself did not expect Ms. Niles to be harmed by his actions or even to discover them. Maine courts have addressed the expected acts exclusion on numerous occasions and have

25

differentiated between "subjective" and "objective" measurements of expectation when determining whether an act is excluded as an expected act. *See Patrons-Oxford Mut. Ins. Co. v. Dodge*, 426 A.2d 888, 892 (Me. 1981) (employing a subjective standard); *Wallace*, 2003 Me. Super. LEXIS 63 (employing an objective standard). While Ms. Niles urges this Court to follow *Patrons* and to apply a subjective standard, Travelers instead asks the Court to follow *Wallace* and to apply an objective standard.[5]  The Court addresses these cases in turn.

In *Patrons*, the relevant policy exclusion provided: "This policy does not apply . . . to bodily injury or property damage which is either expected or intended from the standpoint of the Insured."  426 A.2d at 889.  The Law Court reasoned that "[a]mong various meanings this language may have, one reasonable meaning is that it connotes no *objective normative* criterion but rather refers *only* to the *actual subjective* state of mind of the insured in respect to *results* of his intentional acts."  *Id.* at 891 (emphasis in original).  The Law Court explained how "the language at issue is fairly open to the interpretation that coverage is not 'excluded' if, notwithstanding what the average person in the position of the insured would have foreseen as a consequence of the insured's act, the insured himself did not have the *actual subjective* 'intention' to cause, or the *actual subjective* 'expectation' that a result of his conduct would be,

---

[5]       *Patrons* is a decision of the Maine Supreme Judicial Court and *Wallace* of the Maine Superior Court.  This Court must apply the teachings of the Maine Supreme Judicial Court, which are binding not only on the Maine Superior Court but on this Court in applying Maine law.  *See Erie R.R. v. Tompkins*, 304 U.S. 64 (1938); *Conformis, Inc. v. Aetna, Inc.*, 58 F.4th 517, 528 (1st Cir. 2023) ("Because this case is in federal court by virtue of diversity jurisdiction, state law supplies the substantive rules of decision") (internal citation omitted).  If this Court determined that there is a conflict between the Maine Law Court and the Maine Superior Court, it would apply the ruling of the Maine Supreme Judicial Court.  Here, however, the Court concludes that *Patrons* and *Wallace* do not conflict, and that *Wallace* is more like the facts in this case.

26

bodily injury to another person." *Id.* (emphasis in original).  Because the Law Court determined that the policy in *Patrons* "refer[red] only to bodily injury that the insured in fact *subjectively wanted* ("intended") to be a result of his conduct or in fact *subjectively foresaw as practically certain* ("expected") to be the result of his conduct," it construed the language of the policy in favor of the insured and found a duty to defend where the plaintiff had not subjectively intended or expected the result, even though the result was in fact reasonably expected when measured objectively.  *Id.* at 892 (emphasis in original); *see Burka*, 521 F. Supp. 3d at 103 (employing a subjective standard when the policy had no reasonableness element and excluded only "bodily damage . . . which is expected or intended by the insured").

In *Wallace*, the relevant policy exclusion instead provided: "We do not cover any bodily injury or property damage intended by, or which may reasonably be expected to result from the intentional or criminal act or omissions of, any injured person."  2003 Me. Super. LEXIS 63 at *6 (internal citation omitted).  The *Wallace* Court concluded that the policy "unambiguously bars coverage to an insured when bodily injury could objectively be expected as the result of his criminal act, irrespective of his subjective expectations or intent," *id.* at *8, and because "[i]t is plain that [the plaintiff] is complaining of [the insured's] intentional contact that caused him injury," it "falls squarely within the policy exclusion."  *Id.* at *9.  The *Wallace* Court reasoned that "because bodily injury must reasonably be expected to result when one uses physical force or creates a substantial risk of bodily injury to

another, the . . . act causing that bodily injury bars coverage under [the] policy." *Id.* at *10-11.

This Policy's exclusion here is readily distinguishable from *Patrons* and more akin to *Wallace*. The Policy provides: "Coverage . . . do[es] not apply to bodily injury or property damage . . . [w]hich is intended or reasonably expected by an insured even if the resulting bodily injury or property damage . . . is of a different kind, quality or degree than a reasonable person would have expected or intended." *JSF* ¶ 5. The key here is that the Policy includes the word "reasonably." In *Patrons*, there is no "reasonably expected" language, effectively rendering the provision a subjective standard. By contrast, both in *Wallace* and here, the policy language dictates that the Court must employ an objective standard. Regardless of what Mr. Motsenbocker himself subjectively expected, the Court must examine what a reasonable person should have expected to occur.

Ms. Niles argues that the Court must take into consideration any potential facts that would lead to coverage because "[a]n insured's entitlement to a defense does not hinge on how harsh the plaintiff chooses to be in characterizing the defendant's conduct . . . [t]he sole question is whether the tort that is alleged can be established on the facts actually proven at trial without proving non-coverage." *Pl.'s Opp'n* at 6. Ms. Niles observes how Mr. "Motsenbocker could be liable if he did not install the camera, but was negligent or reckless in not discovering it or in failing to remove it," and the "complaint does not foreclose the possibility that [Mr.] Motsenbocker suffered from mental conditions that have a bearing on the coverage issues." *Id.* at 10. She

explains that "[g]iven the innumerable unknowns, the potential certainly existed that the facts ultimately proved may come within the coverage" under *Mitchell*.  *Id.* (quotation marks omitted); *see Mitchell*, 2011 ME 133, ¶ 10, 36 A.3d 876 ("[A]n insurer must provide a defense if there is any *potential* that facts ultimately proved could result in coverage") (internal citation omitted).  With these arguments in mind, the Court discusses the relevant caselaw, including *Mitchell*, and considers whether, on Ms. Niles' complaint, she could potentially prove facts that would establish a duty to defend under the Policy.

The underlying complaint in *Mitchell* regards a man suing "twenty-three people, including [the insured], numerous other lobster fishermen . . . and certain state officials" and "alleged generally that a group of . . . lobster fishermen had conspired to prevent him from fishing for lobster in the area." *Mitchell*, 2011 ME 133, ¶ 2, 36 A.3d 876.  The underlying complaint "alleged that one or more members of the fishermen's group had converted lobster traps or fishing gear that belonged to [the plaintiff]."  *Id.* ¶ 17.

The Law Court explained that although the complaint "alleges a conversion undertaken 'in an agreed upon and concerted effort,' that fact would not have to be proved for [the plaintiff] to prevail on his conversion claim" because "[f]or instance, [the plaintiff] could prove on this complaint that other individuals cut [his] lobster traps, that [the insured] found and took the traps without knowing that they belonged to [the plaintiff], and that [the insured] damaged the traps in this process."  *Id.* ¶¶ 17, 19.  The *Mitchell* Court reasoned that [the insured] "could have intentionally

'exercise[d] a dominion or control over the goods' in such a way that he accidentally interfered with [the plaintiff]'s rights by taking, damaging, and holding property in which [the plaintiff] has a property interest and right to possession." *Id.* ¶ 19 (quoting *Ocean Nat'l Bank of Kennebunk v. Diment,* 462 A.2d 35, 39 (Me. 1983)) (quotation marks omitted). The Law Court concluded that "[l]iability for conversion could be proved on [the plaintiff]'s complaint without any evidence that [the insured] intentionally exercised dominion or control over traps or gear either (a) with the intent to damage [the plaintiff]'s property or (b) in circumstances where damage to [the plaintiff]'s property was reasonably . . . expected to result." *Id.* ¶ 20 (quotation marks and internal citation omitted).

When a complaint is narrowly drafted, however, the Law Court has held that it "will not consider facts extrinsic to the underlying complaint nor will [it] read allegations into the complaint in determining whether the insurer has a duty to defend." *Barnie's Bar & Grill, Inc.*, 2016 ME 181 ¶ 7, 152 A.3d 613. The Law Court explained that when "faced with policy exclusions that are so broadly written and an underlying complaint that is so narrowly drafted . . . there are simply no intersections between the policy and the complaint in which to find coverage." *Id.* ¶ 8. The Law Court further reasoned "[j]ust as we cannot read extrinsic facts or allegations *into* an underlying complaint in the comparison test, we cannot selectively read facts or allegations *out of* that complaint in order to conclude that the insurer has a duty to defend." *Id.* ¶ 9 (emphasis in original).

Here, Ms. Niles alleged specific facts and narrow causes of action in her complaint that leave little room for the Court to hypothesize about potential scenarios in which the resulting harm was unintended, not reasonably expected, and yet falls within the confines of the narrow underlying complaint. In *Mitchell*, twenty-three people were being sued, many of whom were other lobster fisherman like the insured who could have feasibly damaged the plaintiff's lobster traps such that the insured "found and took the traps without knowing that they belonged to [the plaintiff], and . . . damaged the traps in this process," making the act to fall outside of the intentional acts exclusion. *Mitchell*, 2011 ME 133, ¶ 17, 36 A.3d 876. Here, Ms. Niles brings her claims against only Mr. Motsenbocker, alleging that he acted intentionally and with malice.

In her opposition, for example, Ms. Niles contends that "Plaintiff could establish intentional infliction of emotional distress in other ways: namely that Mr. Motsenbocker did not place the "weather station" device on the wall himself, but allowed it to remain on the wall while knowing that it had the potential—or even the likelihood—of taking and ultimately recording videos." *Pl.'s Opp'n* at 6. But in her complaint, Ms. Niles alleged: "On information and belief, Defendant installed the weather station onto the bathroom wall." *Compl.* ¶ 11. Moreover, she alleged that Mr. Motsenbocker "removed the [w]eather [s]tation from the bathroom wall" in mid-July 2019 and on July 31, 2019, he "returned and reinstalled" it "on the bathroom wall." *Id.* ¶¶ 14-15. Ms. Niles alleged that she and another person discovered the secure digital card inside the weather station on August 3, 2019. *Id.* ¶¶ 18-19. In

addition, Ms. Niles urges the Court to hypothesize that Mr. Motsenbocker "suffered from mental conditions that have a bearing on the coverage issues." *Pl.'s Opp'n* at 10.

The Court is deeply skeptical of Ms. Niles' contention that "inherent to such a surreptitious act is the intent of the tortfeasor *not to be discovered*, and thus not to inflict *any* injury upon the alleged victim whatsoever." *Pl.'s Mot.* at 8-9 (emphasis in *Pl.'s Mot.*). It is always true of surreptitious torts that the perpetrator schemes to avoid detection, and that if the perpetrator avoids detection, the victim does not know she has been victimized. In the context of Mr. Motsenbocker's actions, the invasion of privacy tort occurred when Mr. Motsenbocker invaded her privacy, namely at the moment that the camera caught her movement and filmed her in the bathroom. Moreover, using this logic, Mr. Motsenbocker could have secretly videoed Ms. Niles in her private moments, looked at the videos, shared them on the internet, and so long as Ms. Niles was unaware, he would not have intended or reasonably expected any harm to come to her. Put this way, it seems apparent that Ms. Niles' contention falls of its own weight.

Furthermore, this argument misses the point. It is always true in torts of this sort that the victim has discovered the wrong. Here the Court does not need to resolve the philosophical question of whether an undiscovered harm is a harm because to claim insurance coverage, the tort must have been discovered. Thus, when Mr. Motsenbocker secretly recorded Ms. Niles in her intimate moments, he either actually intended or should have reasonably expected that when she discovered the recording,

she would have been harmed.  The hope not to be caught is different than the certainty that if caught, he would cause harm.

In view of the record before it, the Court concludes that to adopt Ms. Niles' argument would require impermissible speculation as to facts and causes of action not stated in the underlying complaint.  *See York Golf*, 2004 ME 52, ¶ 8, 845 A.2d 1173 ("[In determining the duty to defend,] we do not speculate about causes of action that were not stated"); *see also* 14 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 200:19 at 200-33 (3d ed. 2005) (stating that the duty to defend "cannot be triggered by mere speculation that additional facts or causes of action will be developed at a later time");  *Iasbarrone*, 2013 U.S. Dist. LEXIS 86605, at *7 ("The Plaintiff contends that here, like in *Mitchell*, facts may be proven at trial that do not come within any policy exclusion.  But unlike in *Mitchell*, the Plaintiff is seeking to change the alleged actions themselves").

The damage resulting from Mr. Motsenbocker's acts, as alleged in the underlying complaint, is reasonably expected to cause harm to Ms. Niles.  A reasonable landlord who videotapes his tenant in the bathroom after insisting that she install a clear shower curtain should reasonably expect his tenant to suffer harm. Based on the facts and causes of action alleged in Ms. Niles' underlying complaint, the Court concludes that the harm flowing from Mr. Motsenbocker's acts was reasonably expected and thus fall within the Policy's "intentional and reasonably expected" exclusion.

Finally, the Court concludes that its decision is consistent with public policy as determined by the Law Court. *Landry*, 1998 ME 241, ¶ 11, 720 A.2d 907, 909-10 ("Public policy is also a consideration in reaching this conclusion [that no duty to defend exists]. The general rule is that it is against public policy for insurance to indemnify an insured against his own criminal acts . . . [and o]ur holding today is consistent with public policy") (citing *Perreault v. Me. Bonding & Cas. Co.*, 568 A.2d 1100, 1102 (Me. 1990)).

## B.    Duty to Indemnify

Ms. Niles as assignee claims that because Travelers had a duty to defend Mr. Motsenbocker against these claims, Travelers likewise had a duty to indemnify.

### 1.    Legal Standard

"Where there is no duty to defend, there is no duty to indemnify." *Iasbarrone*, 2013 U.S. Dist. LEXIS 86605, at *8; *Northland Ins. Cos. v. Coconut Island Corp.*, 962 F. Supp. 20, 22 (D. Me. 1997) ("There being no duty to defend, the Court also concludes that there can be no duty on the part of Northland to indemnify"); *Northern Sec. Ins. Co. v. Dolley*, 669 A.2d 1320, 1322 (Me. 1996) ("[D]uty to indemnify is merely a subset of larger sphere of actions for which there is a duty to defend"); *State Mut. Ins. Co. v. Bragg*, 589 A.2d 35, 36 (Me. 1991) ("[T]he duty to defend is broader than the duty to indemnify"); *American Policyholders' Ins. Co. v. Cumberland Cold Storage Co.*, 373 A.2d 247, 250 (Me. 1977) ("Courts have frequently observed that the duty to defend is broader than the duty to pay or indemnify").

### 2. Analysis

Because the Court concludes that Travelers had no duty to defend the claims assigned to Ms. Niles by Mr. Motsenbocker, the Court must likewise conclude that Travelers had no duty to indemnify under the Policy.

## VI. CONCLUSION

The Court GRANTS Travelers' Motion for Summary Judgment (ECF No. 20) and DENIES Jessica Niles' Partial Motion for Summary Judgment (ECF No. 21).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 15th day of March, 2023